UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | docket no. 3:19-cr-322 (MPS) |
| | : | |
| MICHAEL STEVENS, | : | April 21, 2020 |
| Defendant. | | |

**SENTENCING MEMORANDUM OF
DEFENDANT MICHAEL STEVENS**

***Introduction: :*** This sentencing memorandum is submitted in support of the argument that Michael Stevens should be sentenced to the time that he has already served.

***Factual and procedural background:*** Michael Stevens pleaded guilty pursuant to Rule 20, Fed. R. Crim. P., to a conspiracy to make and pass counterfeit federal reserve notes (hereinafter simply "counterfeit") in the Eastern District of Virginia (hereinafter, the "Eastern District").

On January 16, 2019, Fredericksburg, VA, police arrested Meliek Garland, the half-brother of Michael Stevens, who had attempted to pass a counterfeit at a Walmart. When they searched Garland, they found sixty-four counterfeit $50 notes and marijuana. Walmart provided surveillance footage that showed two females and two males arriving at the Walmart in the same vehicle as Garland and some of them could be seen passing counterfeit $50 notes.

The next day, Henrico County, Virginia, police responded to a Best Western hotel, where the odor of marijuana emanating from a room had been reported. In the room were Michael Stevens, Chadwade Chambers, Alma Smith, Dymond

Alexus Vaughn, and a large amount of counterfeit.  The two women and Chambers were the people depicted attempting to pass counterfeit in the Walmart surveillance videos and they were arrested.  Michael Stevens was not.  On Michael Stevens' person, officers found a receipt for a cash purchase at American Eagle Outfitters in Fredericksburg, VA.  Michael Stevens said the receipt belonged to Chambers.   American Eagle Outfitters surveillance videos did show Chambers using counterfeit in the transaction that was memorialized by the receipt

Although Michael Stevens was not arrested,  he was indicted with the other four as a co-conspirator by a  federal grand jury in the Eastern District after he had returned to New York.  The  four co-defendants who were arrested remained in custody for about seven months, until their sentencings in the Eastern District.

Meanwhile, on May 7, 2019, Enfield police arrested Michael Stevens and Brianna Hackman at Dicks Sporting Goods as they attempted to purchase goods with counterfeit and to return merchandise that they had earlier purchased with counterfeit.  When arrested, the two had counterfeit on their persons.  In searching their car, the police found $4600 in counterfeit bills (some cut, some on sheets of paper), a copying machine, and blank paper.  PSR ¶ 10; Affidavit in Support of Complaint ¶ 5-7.

On the night of the arrest, Michael Stevens was interrogated by Secret Service Special Kendel Ferguson.  The next morning, May 8, Michael Stevens provided a written statement to the special agent.  Stevens said that he had come into the copying equipment when "K.D., my brother[']s friend had got locked up.

He left the equipment at my house."[1] He said that when he came back to New York from Virginia, having no money took a toll on him and he "had the stupid idea of cutting some of the money that was left to make a quick buck."  He said he used the counterfeit to buy "food, clothes and stuff for my daughter."  He said "I haven't been making money.  I d[on't] k[now] how I was trying to teach myself." Attachment at 5-6.

The local Secret Service agents leaned of the outstanding federal arrest warrant in the Eastern District and Michael Stevens was arrested on that indictment.  Mr. Stevens was brought into federal court and quickly agreed to plead guilty.  The paperwork took awhile, though, and after he had been incarcerated for about nine months, Michael Stevens entered the Rule 20 guilty plea that has led to this sentencing.  The state charges against Michael Stevens and Hackman were nolled.

Because his anticipated guideline range was relatively low and because he had served 269 days in pretrial detention, the Court released Michael Stevens on bond on January 31, 2020.

On February 22, 2020, Mr. Stevens was arrested  in Dehli, New York, a town in the Northern District of New York.  He was in the passenger seat of a vehicle that had been stopped for a motor vehicle violation.  Under the passenger seat were two envelopes.  One contained 39 counterfeit $50 bills.  The other contained 37 counterfeit $50 bills.  There were four men in the vehicle.  Two of

---

[1]The Government's Garland Position indicated that Mr. Stevens had said that the equipment belonged to Garland.  Government's Garland Position at 5.

4

them, Garland and Chambers, were co-defendants the Virginia conspiracy.  None admitted to ownership of the counterfeit.  After his arrest, Mr. Stevens was released on bond.

Lest the Court believe that Mr. Stevens had travelled to Dehli for the purposes of a counterfeit uttering venture, we have attached a letter from Mr. Stevens' friend, a student at State University of New York at Dehli, attesting that Michael and his friends had come to Dehli to visit her and they stayed with her the night before the arrest.  Attachment at 3.

On March 6, 2020, the Court conducted a bail-revocation hearing at which the defense argued that the evidence was insufficient to establish that Mr. Stevens had known that the counterfeit was under the seat; that he had not understood that the conditions of his bond allowed him to be present only in the Southern and Eastern districts of New York, and Connecticut; and that he had telephoned his pretrial services officer immediately after his arrest, leaving a message (it was the weekend) which his pretrial services officer apparently did not receive.  The Court was unpersuaded and revoked Mr. Stevens' bond.  He has been incarcerated at the Wyatt Detention Center ever since.

Mr. Stevens' presentence report has been prepared.  It estimates his recommended guideline range as 24-30 months, somewhat higher than that contemplated in the plea agreement letter.  *See* PSR ¶ 89.  Mr. Stevens has been incarcerated since his bond was revoked.

***Disagreements with the presentence report:***  The Presentence Report calculates the offense level as 15 and the criminal history category as III.  PSR ¶¶

52, 60.  At 15/III, the guideline recommended sentencing range is 24 to 30 months.  PSR ¶ 30.  Michael Stevens pleaded guilty pursuant to a plea agreement that contemplated that he would be at an offense level 11 and criminal history category I, which would have produced a recommended guideline range of 8 to 14 months, the same guideline range assigned to the male co-conspirators in the Eastern District.

There are three significant differences between the PSR and the plea agreement.

The first is in the Criminal History Category.

The PSR attributes four criminal history points to Mr. Stevens and places him in Criminal History Category III, PSR ¶ 60 ; the plea agreement placed him in Criminal History Category I.   We now contend that Mr. Stevens is properly placed in Criminal History Category II.

Two criminal history points are added because the PSR believes that Michael Stevens was under a criminal justice sentence (New York state probation) in January, 2019, when he entered into the conspiracy in the Eastern District. Specifically, the PSR notes that on July 13, 2017, Michael Stevens was convicted of possession of a forged instrument in the second degree and was sentenced to five years' probation and thirty days of community service.  PSR ¶¶  57. 59.  Mr. Stevens reports, however, that the probation imposed upon him in July, 2017, was violated; that as a result of the violation he was required to serve a short period in jail and the probation was terminated; that as a result of the violation he was not on probation when he went to Virginia in January 2019.   Mr. Stevens' report is

corroborated by the fact that since his arrests in Connecticut and in New York and since his indictment in the Eastern District, and since his two periods of incarceration,  no New York probation officer has made any inquiry of undersigned counsel, of any prosecutor or law enforcement officer, or of Michael Stevens' family, as to why he might not be reporting for probation meetings.  No New York probation violation warrant appears to have issued for him.

We have requested that United States Probation Officer Courtney Miller submit a collateral request to United States probation officers in New York in order to verify Mr. Stevens' report.  Without the two points added pursuant to U.S.S.G. § 4A1.1(d), Mr. Stevens would fall into Criminal History Category II.  At 15/II, his guideline range is 21-27 months.

The second disagreement  is not really a disagreement and is, perhaps, a quibble: the PSR's enhancement for manufacturing.  The PSR enhances the offense level pursuant to U.S.S.G. §2B5.1(b)(2),  PSR § 45, because "Mr. Stevens admitted that he used equipment to make counterfeit Federal Reserve Notes." The plea agreement did not include in its guideline calculation the two-point manufacturing enhancement.  The PSR is correct in its enhancement, but it is necessary to add a few words about "manufacturing."

 In his affidavit in support of the arrest warrant, the case agent states that Michael Stevens "admitted to being involved in counterfeiting.  Specifically, he said that in December 2018, STEVENS started manufacturing counterfeit FRNs in fifty dollar and twenty dollar denominations in his home."   This is a reference to Michael Stevens' written confession, in which he admitted to cutting counterfeit

from sheets of paper that had previously been printed on the photocopier.  Cutting counterfeit from sheets that others have copied is, we suppose, a part of manufacturing process, but in calculating the guideline for the plea agreement letter, we did not immediately recognize it as "manufacturing," and this is one reason the plea agreement calculation of the sentencing guidelines is different from the PSR's calculation.

The term "manufacturing," after all, may encompass a engraver in the employ of a foreign adversary peering through a jeweler's loupe as he painstakingly copies the microprinting on a United States note.  It may also encompass a giggling girlfriend high on pot  who hands blank sheets of paper to a boyfriend to insert in the feeder bin of a copy machine.  Cutting counterfeit from the sheets of paper on which it is copied, which is what Mr. Stevens says he did, may be manufacturing, but it is manufacturing at its lowest level, and we did not recognize it as manufacturing.

We should have identified the enhancement, however, because whether or not Mr. Stevens himself manufactured counterfeit notes makes no difference to the calculation of the guidelines.  Section 2B5.1(b)(1) provides for the enhancement "[i]f the defendant (A) manufactured or produced any counterfeit obligation or security of the United States, or *possessed or had custody of or control over a counterfeiting device or materials used for counterfeiting*; or (B) *controlled or possessed (I) counterfeiting paper similar to a distinctive paper*."  (Emphasis added).  Even if all Michael Stevens did was to cut counterfeit from sheets on which someone else had copied them, the printer and paper in the trunk of his car

8

when he was arrested in Connecticut qualifies him for the two-level enhancement. *See United States v. Suarez-Gonzalez,* 760 F.3d 96, (1st Cir. 2014) (photocopier considered a counterfeit device).

We do, however, request that paragraph 45 be amended as follows:

> Mr. Stevens admitted that he possessed the equipment that was used to make counterfeit Federal Reserve Notes. Two levels are added if the defendant possessed counterfeit devices.  § 2B5.1(b)(2).

Third, we assert, as we did during the bail revocation hearing, that Mr. Stevens did not know that counterfeit was concealed under the seat in which he was sitting when he was arrested in Dehli, New York.  The Court has already conducted a hearing on the issue, and we have nothing to add to the documentary reports that were presented and the arguments made during the bail-revocation hearing, other than the attached letter from Mr. Stevens' Dehli College friend, Attachment at 3,  which does no establish innocence, but at lease suggests that when Mr. Stevens and his friends drove to Dehli, they were not engaged in a counterfeit-uttering expedition.  As we argued during the course of the hearing, it appears that no counterfeit matching that seized from the vehicle has been reported as being passed in Dehli or its environs, and we have no information to suggest that there has been any report since the hearing.

We thus request that the Court decline to accept the recommendation of the PSR, ¶ 41, that Mr. Stevens not benefit from a two-level offense-level reduction for acceptance of responsibility.

### *Downward departure for disparity between plea agreement prediction of*

***guideline range and Court's determination of that range:*** In *United States v. Fernandez,* 877 F.2d 1138, 1145 (2d Cir. 1989), the defendant argued that he had been unfairly surprised when he learned that his sentence would be based upon the entire quantity of drugs that were a part of the course of conduct to which he pleaded guilty rather that the more limited amount on which his plea of guilty and the plea agreement were based.

Although the district judge declined to depart downwardly based on the defendant's claimed misapprehension, the Court of Appeals took pains to affirm that the district court enjoyed the discretion to depart in these circumstances:

> Significantly, the Commission has been careful not to foreclose broad judicial discretion in plea bargaining situations. In discussing its very limited strictures on plea bargains, the Commission acknowledged that "[b]ecause of the difficulty in anticipating problems in this area, and because the sentencing guidelines are themselves to some degree experimental, substantive restrictions on judicial discretion [regarding plea agreements] would be premature at this stage of the Commission's work." Guidelines Manual, supra, ch. 6, pt. B introductory comments, at 6.5. Thus, "[w]ith respect to ... plea bargaining, the Commission has basically left the problem, for the present, where it found it." Breyer, supra, at 31.
>
> Since the Sentencing Commission has not yet fully considered plea bargaining as a factor in shaping the current Guidelines, cf. 18 U.S.C. Sec. 3553(b), it is not startling that a district court presently may depart from a Guidelines sentence in order to give effect to a plea bargain if such a departure is warranted. Congress has cautioned that courts should not sanction plea agreements if they will "result in undue leniency or unwarranted sentencing disparities," S.Rep. No. 225, supra, at 167; see Guidelines Manual, supra, ch. 6, pt. B introductory commentary, but a district court presented with a plea agreement retains discretion to depart so long as the sentence that results reflects the seriousness of the crime and deters future misconduct, see 18 U.S.C. Sec. 3553(a) (Supp. V 1987) (statutory factors to guide sentencing decisions).

As this Court is well aware, since the *Fernandez* decision, the Court of

Appeals has "long held that district courts have the discretion to give effect to Guidelines calculations in plea agreements that result in downward departure from the correct Guidelines range." *See, e.g.*, *United States v. Byrd*, 672 Fed.Appx. 125 (2d Cir. 2017) (summary affirmance of sentencing by Shea, USDJ). The question thus presented is: should the Court do so?

The gist of this plea agreement was that Michael Stevens would plead guilty, as his co-conspirators had, to the conspiracy-to-counterfeit indictment in the Eastern District, that he would not be required to plead guilty to a separate indictment arising from his acts in Connecticut, and that the Connecticut acts would be viewed as part of the same course of conduct as in the Eastern District.

There are three discrepancies between the plea agreement and the presentence report.

With respect to the difference in offense level, we are confident that the correct level is two, but if we are wrong, we request that the Court horizontally depart, and add that placing Michael Steven in criminal history category III overstates the seriousness of his past criminal conduct.

With respect to acceptance of responsibility, we have requested that the Court deduct two points from Mr. Stevens offense level. If the Court decides against us on that issue, it is difficult to argue that there was any deficiency in the plea agreement that would justify a departure on these grounds.

With respect to the manufacturing enhancement, the plea agreement's failure to include a two-point enhancement was the result of undersigned counsel's concentration on conduct in the Eastern District and overlooking the possession of

the counterfeit devices in Connecticut and this, we think, is a situation in which the Court should depart downwardly by two levels.

### *Statutory factors to be considered in imposing a sentence*

The Court is required by 18 U.S.C. § 3553 to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in the statute and is to consider the following factors:

*(1)(a).  The nature and circumstances of the offense.*  The offense can be described as unsophisticated, small-scale but persistent, and not very successful, thievery, a bit more involved than most shopliftings, a bit less calculated than most professional boosting efforts.    The sentencing memoranda of the government in the Eastern District described "the limited duration and scope of the scheme, as well as limited losses to merchants . . . ."  Government's Position (Chambers), ECF # #83 at 16; *accord* Government's Position (Vaughn )  ECF # # 94 at 4.  The duration and scope of Michael Stevens' offense was, of course, somewhat greater because of his activities in Connecticut.

*1(b).  The  history and characteristics of the defendant.*  As he does in every sentencing memorandum, the undersigned seeks to use this section of the sentencing memorandum in order to provide the Court with some insight into the defendant's character that is not obvious in the investigative reports, presentence report, or other memoranda, but in Michael Stevens' case, it is a difficult task.  The young man is so reticent that  it is difficult to ascertain the level of his intelligence, judge his honesty and veracity, or even perceive whether he has a sense of humor.

The author or the presentence report did a good job of drawing Michael out

during the presentence interview, much better than the undersigned during his background interviews.  The following exchange was typical.  How was his childhood?  According to Michael, fine.  In what activities did he engage?  Well, none.  How did he occupy his time in, say, junior high?  Well, he mostly stayed home.  Why did he stay home instead of going out with friends?   Because the neighborhood was infected with Crips gang members.

Michael, it emerged through persistent questioning. was reclusive by nature, stayed in the house most of the time because the neighborhood was not a safe place.  PSR ¶ 66.

His family, he said, was poor (he never once went on a vacation), but there was always enough food in the house and the electricity was never shut off.  PSR ¶ 66.  (His mother reported that the family was homeless for more than a year.  PSR ¶ 72.)

His father, he said, was a good man whom he sees three or four times a year. *See* PSR ¶ 65.  ( According to Michael's mother, his father was a drug addict, in and out of jail for fighting and failing at drug treatment programs, out of contact with his children for years at a time.  PSR ¶ 71.)

According to Michael, there are no mental health or substance abuse issues among his family members.  PSR ¶ 65.  (According to filings in the Eastern District, his brother Garland suffers from serious mental health issues and Michael's father is a lifelong drug addict, according to his mother.  PSR ¶ 71.)

Michael Stevens is not academically gifted (*see* PSR ¶ 70) nor, as this prosecution demonstrates,  is he gifted in the criminal arts.  He smokes lots of

marijuana.  PSR ¶ 77.   He oversleeps and misses appointments.  There is something not quite right with him: "things that are common sense to most people do not come naturally to [him]."  PSR ¶ 70.  His mother says that his life is disorganized not "because he is a bad person but because he does not process things like everyone else does."  PSR ¶ 73.

His mother describes him as "very respectable," and she is right, but his quiet politeness and gentle taciturnity make it very difficult to get a handle on what it is that makes Michael Stevens different.  The undersigned has noted that his year in prison, where the role models tend to be loud-mouthed and belligerent, seems to be drawing Michael out of his shell, but the undersigned is not sure that Michael's emergence from "never [being an] outspoken or outgoing type,"  PSR 69, to being more like his tier-mates  is such a good development.

Although he is twenty-six, he seems more like a high school slacker than someone who is about to be sentenced in federal court for a serious felony.

*(2) the need for the sentence imposed--*

*(A) to reflect the seriousness of the offense.*  As we have noted, the offense involves low-level, unsophisticated but persistent thievery.  As sentence of time served would properly reflect its seriousness.

*to promote respect for the law, and to provide just punishment for the offense*.  We think that this phrase could be more frankly stated as "to instill in the defendant and those similarly situated a fear for the law and what will happen to them if they violate it" and "to satisfy to the extent possible the victims' demands for retribution."  We think that the time that Michael Stevens has served is a

sufficient deterrent to Michael and those like him (to the extent that they even hear about the sentence). A sentence of time served will also, we think, satisfy the retributive urges of the chain stores that are the victims in the case.

   ***(B) to afford adequate deterrence to criminal conduct***:  To be more precise than we were in the paragraph above, we do not think that additional prison time will promote deterrence to any greater degree than the sentence already served.

   In addition, the collateral consequences of a federal felony conviction provide further deterrence: it is difficult to obtain a job, or a loan, or a spouse, after convictions such as this one.

   The suddenness of the apprehension and imprisonment -- one moment you are out with a girlfriend at Dick's and for the next year your are jailed, with no voluntary surrender, no getting your personal affairs in order, no sad goodbyes to mom and girlfriend -- is another deterrent.

   ***(C)  to protect the public from further crimes of the defendant***.
In a case such as this one, the cost of incarcerating the defendant is probably greater than the economic damage that the defendant is likely to wreak, should efforts to reform him fail.  Given his past history, if Michael returned to thievery, he would probably soon be apprehended and, given this conviction, detained, further limiting the damage to the public.

   ***(D) to provide the defendant with needed educational or vocational training,  medical care, or other correctional treatment in the most effective manner.***  As in most sentencings, the defense urges that this factor is the most important of the sentencing statute's objectives, and if our analysis of Michael as a

shy slacker is accurate, we may be right in this case.  It cannot be ignored that

Michael Stevens has not flourished while in programs or under supervision:  he

dropped out of Job Corps, violated his state probation, and made a mess of his

release in this case.  Still, federal supervised release is something different from

what has been imposed on Michael Stevens before and could just impose on him

the kind of discipline he needs in order.   As his mother told the author of the PSR,

Michael "is not at a point where he is 'unsaveable.'"  PSR ¶ 73,

   With respect to medical care, we urge that a sentence to time served would

advance the objective of keeping Michael healthy by removing him from an

environment where it is next-to-impossible to follow the social-distancing,

masking, and washing recommendations of the Centers for Disease Control.

   The presentence report indicates:

> 76.  Michael Stevens is a 26-year-old black, non-
> Hispanic origin male who stands 5'11" tall and weighs
> 160 pounds. He has brown eyes and black hair. *He
> reported the only medical condition he has is asthma, for
> which he uses an inhaler. The defendant advised that
> when he was younger, he had to use a machine to
> prevent asthma attacks.* According to records from
> Wyatt, Mr. Stevens reported he has asthma however, he
> refused to participate in their intake physical exam.

PSR ¶ 76 (emphasis added).  Although the information concerning his suffering

from asthma comes from the defendant himself, it should be noted that at the time

of his PSR interview and at the time of his PSR interview and his admission to

Wyatt there was no reason for him to malinger: the corona virus was not so far

advanced as to suggest to anyone that asthma might be a reason for  releasing a

defendant on bond.  His mother and younger brother also suffer from asthma.  PSR

16

¶ 65.  His mother has contacted the undersigned, urging that this motion be filed because, she reports, her son suffers from asthma.

If he must serve additional time, Michael Stevens would be returned from court to the Wyatt Detention Center.  The Wyatt Detention Center has been ordered by the Rhode Island district court to file weekly summaries of testing results and other information relating to the epidemic.  *In re: Wyatt Detention Center*, D.R.I. docket no. 20-mc-00004.  Its June 11, 2020, report (Attachment 4), stated that 947 tests had been given to inmates; that there were 53 positive results and 25 active cases.  352 tests had been given to staff.  Fifteen were positive and 5 cases were active.

Michael Stevens would probably be transferred from Wyatt to the MDC in Brooklyn, thought by many to be the worst of the Bureau of Prisons' facilities.[2] As of June 13, 2020. the Bureau of Prisons reported that there were three active cases among inmates and six active cases among staff.[3]  Nationwide, as of June 13, the Bureau of Prisons reported that there were 1,622 federal inmates and 196 BOP staff who had confirmed positive test results for COVID-19 nationwide. On that date, 4,503 inmates and 457 staff have recovered. There had been 80 federal inmate deaths and 1 BOP staff member death attributed to COVID-19 disease.[4]

A sentence of time served would advance the objective of providing Mr.

---

[2]*See, e.g.* https://www.huffpost.com/entry/mdc-brooklyn-conditions_n_5c59bb62e4b00187b 5556cdf (last viewed June 13, 2020).

[3]https://www.bop.gov/coronavirus/ (last viewed June 13, 2020).

[4]Id.

17

Stevens with medical treatment by removing him from an environment in which the potential need for such treatment is intensified.

*(3) the kinds of sentences available*. A sentence to time served, a period of supervised release, a $100 special assessment and a restitution order identical to that imposed on the Eastern District co-defendants -- the sentence we seek -- is an available sentence.  PSR ¶ 93-102.

*(4) the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines*.  As we gave argued, we believe that Mr. Stevens falls in criminal history category II, that his offense level, with acceptance, is thirteen, two levels higher than that of his co-defendants because of his possession of a counterfeit device and paper, and that the Court should downwardly depart two levels to 11.  At 11/II, the sentencing range is 10-16 months.

Mr. Stevens was incarcerated from May 7, 2019, when he was arrested by the Enfield Police, until January 31, 2020, when he was released on bond by the Court.  That period is 269 days.  He has been incarcerated from March 6, 2020.  If he were sentenced on June 22, 2020, he would have served an additional 108 days, for a total of 377 days -- more than a year.  Considering that federal prisoners usually serve 85 % of their sentences, a sentence of time served is the equivalent of a sentence of 443 days, almost 15 months.

*(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.*    Although

18

we recognize that this factor is meant to reduce disparities among defendants nationwide, it is instructive to set forth the sentences of Michael Stevens' co-defendants.

All four co-defendants pleaded guilty in the Eastern District. All were sentenced to make $1320 in restitution, to 3 years of supervised release, and, of course, to a $100 special assessment.

Garland (whose guideline range was 8-14 months)[5] was sentenced to 7 months' imprisonment. ECF # # 78.

Chambers (whose guideline range was 8-14 months) was sentenced to 8 months' imprisonment. ECF # #90.

Smith (9/I) whose guideline range was 4-10 months, and was sentenced to 7 months' imprisonment. ECF # #88.

Vaughn (also 9/I), whose conduct and culpability were, according to the government, the equivalent of Smith's,[6] was sentenced to 7 months' imprisonment. ECF # # 96.

Michael Stevens' offense level (15) is four levels higher than the offense level of his male co-conspirators (11). The difference is the result of the Virginia

---

[5] "That calculation includes (1) a base offense level of 9 under U.S.S.G. § 2B5.1(a); (2) a 4-level increase because the face value of the counterfeit items exceeded $15,000 but was less than $40,000; and (3) a 2-level reduction for acceptance of responsibility. With a Criminal History Category of I, the defendant's correctly calculated advisory Guidelines range is 8 to 14 months' imprisonment." Position of the United States on Sentencing Factors (hereinafter "Government's Position"), ECF #200 at 4. Where the sentencing memoranda set forth the offense level and criminal history category of a defendant. we have set them forth in a parenthetical, such as "(11/I)."

[6] Government's Position (Vaughn), ECF # 94 at 5 n.1.

co-conspirators' receiving of a two-point reduction for acceptance of responsibility and their avoiding a two-point enhancement for possessing devices and materials used for counterfeiting.  His female co-conspirators had offense levels (9) that were  two levels below that of the males (11) and we cannot tell from the filings in the Eastern District why the females had offense levels are lower than those of their male co-conspirators, although the undersigned has frequently noted downward departures that appeared to be based on a defendant's  possession of double x chromosomes.  Nor can we tell from the pleadings why three of the conspirators received seven-month sentences and Chambers received eight.  We do assert that Michael Stevens' conduct in the Eastern District was less severe than that of his co-defendants' -- which is why the local officers did not to arrest him when they arrested the others -- but recognize that this lesser culpablity is tempered by Michael Stevens' subsequent conduct in Connecticut.

As we have noted, if the Court were to sentence Mr. Stevens to time served, the sentence would be the equivalent to a roughly fifteen-month sentence, about twice the sentence of his co-conspirators.

*(7) the need to provide restitution to any victims of the offense.*  The amount of the restitution order of each of the co-defendants is  $1320 and the plea agreement contemplates that a restitution order in this amount will be issued.

*Other considerations:*  Because this sentencing memorandum is prepared on days of nationwide protests against racial injustice, it is interesting to speculate about  what this case might have looked like if Michael Stevens and his friends had been white Choate or Yale students rather than black (or, in Michael's case, half-black) denizens of a Brooklyn ghetto.  The undersigned, having decades ago prosecuted a large group of Choate-Rosemary Hall students who conspired to import cocaine from Columbia, is in as good a position as anyone to engage in this interesting (but probably irrelevant) speculation.

It is fairly safe to say that the four conspirators arrested in Virginia, none of whom had prior convictions, would not have remained in pretrial custody for long. Skilled and expensive Washington criminal lawyers would have swiftly gotten them out on bond.  Michael Stevens would have been arrested at his parents' Farmington mansion the day after the return of the indictment.  There would have been no difficulty finding him.  A parental reign of terror would have descended on the conspirators.  Michael's  parents would have searched those places in their house to which Michael had easy access and would have discovered and seized the printer, the paper, and the remaining counterfeit.  The parents would have been faced with an ethical dilemma frequently encountered by the parents of young criminals: do they surrender the evidence to the authorities?  At worst, they would have destroyed the evidence, and Michael would never have had the opportunity to engage in further counterfeit activities in Connecticut.

Choate  (or Yale) would have expelled the counerfeiters, and Michael and

his friends would have been sent off to some expensive residential military school, where rich parents send children who are an embarrassment, hoping "the discipline of the school would channel his energy in a positive manner."[7]  His half-brother Garland, who, the filings in the Eastern District indicate, suffers from some serious mental problems, would have immediately been consigned to the care of a psychiatrist, if, indeed, he had not enjoyed the best of psychiatric care throughout the course of his life.  Michael, too, would undoubtedly have been sent for psychiatric care.

If, by some chance, Michael had remained in pretrial incarceration, and his attorney had attempted to obtain his release because of the COVID-19 epidemic, his attorney would not have, as here,  submitted to the court a single emergency-room report of uncertain date, but rather would have amassed a hundred pages of reports from pediatricians and longtime family doctors, and affidavits from them too, attesting to Michael's weakened lung capacity and the certainty that if he remained in custody, he would surely die.

Restitution would swiftly have been made to the corporate victims, and the defendants' Washington attorneys would have hit up contacts in the victim corporations to provide letters to the prosecutors and the court indicating that the firms would not be averse to the defendants' entering into a pretrial diversionary program.

The sentencings here and in the Eastern District would have been very

---

[7]https://www.washingtonpost.com/news/answer-sheet/wp/2015/07/17/yes-donald-trump-really-went-to-an-ivy-league-school/ (last viewed on June 13, 2020).

22

different, and the docket sheets would record letters from dozens of teachers, coaches, counsellors, music teachers, neighbors, parents of friends, and supervisors at non-profits where college-bound students perform community service to beef up their applications, all asserting that the crimes were aberrations and that the defendants possessed infinite promise.  There would certainly be more, at least, than, as here, a letter from a loving aunt and a co-worker at MacDonald's, both heartfelt but of limited persuasiveness.  Attachment at 1-2.

This speculation may strike the Court as silly, because counsel is contrasting the upper 1% with people near the bottom, and what is the likelihood that Choate or Yale students would  attempt to pass a thousand dollars worth of counterfeit at a Walmart?  If criminally inclined, a Choate or Yale student would harbor criminal ambitions on a grander scale and, possibly, the cleverness to get away with it.

*Conclusion:*  For the above-stated reasons, the defendant Michael Stevens respectfully requests that the Court sentence Michael Stevens to the time that he has served.

Respectfully submitted,

s/s

JEREMIAH DONOVAN
123 Elm Street--Unit 400
P.O. Box 554
Old Saybrook, CT 06475
(860) 388-3750
FAX 388-3181
Juris no. 305346
Fed.bar.no. CT 03536
jeremiah_donovan@sbcglobal.net

23